**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FTX TRADING LTD., *et al.*, | ) | Case No. 22-11068 (JTD) |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
| _____ | ) |  |
|  | ) |  |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) | Adv. No. 23-50380 (JTD) |
|  | ) |  |
| MICHAEL GILES, *et al.*, | ) |  |
|  | ) |  |
| Defendants. | ) | **Re: Adv. D.I. 96 and 97** |
| _____ | ) |  |
|  | ) |  |
| ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) | Adv. No. 23-50379 (JTD) |
|  | ) |  |
| ROCKET INTERNET CAPITAL PARTNERS II SCS, *et al.*, | ) ) |  |
|  | ) |  |
| Defendants. | ) | **Re: Adv. D.I. 42** |
| _____ | ) |  |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Alameda Research Ltd. ("**<u>Alameda</u>**"), West Realm Shires, Inc. ("**<u>WRS</u>**"), and

West Realm Shires Services, Inc. ("**<u>WRSS</u>**") (together, the "**<u>Plaintiffs</u>**") commenced these

actions[1] seeking to avoid and recover transfers made in connection with Plaintiffs' acquisition of

Embed Financial Technologies Inc. ("**Embed**").  While two separate adversary proceedings were

commenced, the complaints in both are substantially the same.[2]  Defendants[3] in both actions

have moved to dismiss (the "**Motions**").[4]  For the reasons that follow, the Motions are granted in

part and denied in part.

## FACTS ALLEGED IN THE COMPLAINTS

The Parties

Plaintiffs are a part of the larger "FTX Group" of companies.[5]  Prior to the filing of the

Chapter 11 Cases, Alameda was a cryptocurrency trading firm.  WRS is a Delaware holding

---

[1] Citations to the adversary dockets will be referenced using "Adv. D.I. ___", and citations to the docket in the primary bankruptcy case will be referenced using "D.I. ___".

[2] The same claims are asserted in both cases, except that in Case No. 23-50380, Plaintiffs also assert a claim for preferential transfer pursuant to Section 547(b) of the Code against defendant Michael Giles. The defendants in each action are also different.

[3] The term "**Defendants**" as used herein will refer to all moving parties across both actions.  The term "**Embed Defendants**" will refer to following defendants: The 2016 Karkal Family Trust; Acrew Capital Fund (A), L.P.; Acrew Capital Fund, L.P.; Acrew Capital MGP, LLC; Bain Capital Venture Fund 2019 LP; BCIP Venture Associates II, L.P.; BCIP Venture Associates II-B, L.P.; BCV 2019-MD Primary, L.P.; Buckley Ventures GP, LLC; Buckley Ventures, LP; Correlation Ventures II, LP; Fin VC Regatta I, LP; Homebrew Ventures III, LP; Jonathan Christodoro; Kamran Ansari; Launchpad Capital Fund I LP; LGF II, L.P.; Liquid 2 Ventures Fund II, L.P.; Propel Venture Partners, LLC; Propel Venture Partners US Fund I LP; Putnam (Warren Lowell Putnam & Brynn Jinnett Putnam, Tenants in Common); Samuel Jones; Torch Capital II, LP; Transpose Platform o/b/o TI Platform Fund II; TI Platform NLI Venture Limited II; Transpose Platform Fintech Fund II, L.P.; TI Platform Fund II, LP; Treasury Fund I, LP; Y Combinator ES20, LLC; and YCC20, L.P.   Distinctions will be made throughout this Opinion to the extent necessary to address arguments raised by only some defendants.

[4] Three motions to dismiss and five joinders were filed across two actions.  In Case No. 23-50380, the following motions and joinders were filed:  Adv. D.I. 97 (Embed Shareholder Defendants' Motion to Dismiss), Adv. D.I. 96 (Non-Embed Defendants' Motion to Dismiss), Adv. D.I. 108 (Joinder of the Alumni Ventures Defendants), Adv. D.I. 109 (Joinder of Lindsey Boerner, *et al.*), and Adv. D.I. 110 (Joinder of Paul Trone).  In Case No. 23-50379, the following motions and joinders were filed: Adv. D.I. 42 (Non-Embed Defendants' Motion to Dismiss), Adv. D.I. 46 (Joinder of Rocket Internet Parties), and Adv. D.I. 83 (Joinder of GFC Global Founders *et al.*).  All motions and joinders will collectively be referred to as the "**Motions**."

[5] Complaints at 3 n. 4 ("The FTX Group is comprised of four silos. These silos include: (a) a group composed of Plaintiffs and Debtors WRS, WRSS, and their Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiff and Debtor Alameda, Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay

company with several subsidiaries, including WRSS, which did business as FTX.US, the cryptocurrency exchange founded to offer cryptocurrency trading services to U.S. customers.

Plaintiff entities were run by a small group of individuals that Plaintiffs refer to as the "**FTX Insiders**," comprised of WRS co-founders Samuel Bankman-Fried ("**Bankman-Fried**"), Zixiao "Gary" Wang ("**Wang**"),[6] and Nishad Singh, along with Alameda's CEO Caroline Ellison ("**Ellison**").[7]

Defendant Embed is a stock clearing firm and FINRA licensed broker-dealer founded by defendant Michael Giles ("**Giles**").  The remaining Defendants are present and former Embed executives and former Embed equity holders.

The Deal

In mid-March 2022, WRS began negotiations with Giles to acquire Embed when Giles visited the FTX headquarters in the Bahamas.  While there, Giles wrote to a senior Embed employee that the President of FTX.US had told him that they were empowered to write a check "tomorrow" if they agreed to deal terms.  Giles added:  "Obviously joking[,] but I think they would move fast[.]"[8]

By April 15, 2022, WRS and Embed had signed the "Memorandum of Terms," which ascribed a $220 million enterprise value to Embed and provided for roughly $63 million in retention bonus payments to Embed employees, including $55 million to Giles.

The $220 million enterprise value of Embed that WRS agreed to for purposes of the acquisition was proposed by Giles based on little more than his representation that it would

---

Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.").
[6] Bankman-Fried and Wang are also co-founders of Alameda and WRSS.
[7] Ellison was at varying points in time sole CEO and co-CEO, along with Bankman-Fried.
[8] Complaints ¶ 37.

"enable [him] to get a deal over the line with investors."  WRS did not retain an investment bank or any other outside advisor to conduct a valuation analysis of Embed, nor did it require Giles to make detailed representations about Embed's value as a going concern or as a future subsidiary of WRS.  WRS and Embed did not set up a "data room" for information sharing until weeks after the term sheet had been signed and, even then, WRS did not perform any meaningful due diligence concerning Embed's purported value or its crucial technology.[9]

When Giles was asked on April 19, 2022, by another senior Embed employee about the expected diligence process with WRS, Giles responded, "I don't think they are too worried." According to Giles, WRS representatives had told him that they did not need to perform due diligence because a WRS subsidiary was already an Embed customer, although that relationship was barely a few months old and had not been fully implemented.  On that same day, Laurence Beal ("**Beal**"), Embed's Chief Technology Officer, asked another senior employee whether she had "an idea of what [WRS] wanted to do for due diligence."  After the other employee replied, "No, not yet," Beal said that WRS "didn't do a ton of dd [due diligence]" before its subsidiary became a customer of Embed.  He then added:  "I get a sense that they are [cowboy emoji] over there[.]"[10]

On May 9, 2022, a senior Embed employee wrote to Brandon Mann, a software engineer at Embed, that she was "so concerned with how many bugs" the President of FTX.US had noticed in Embed's platform.  On May 10, 2022, Giles wrote to the same senior employee that "what will blow up the deal [with WRS] will be death by a thousand cuts issues with tech." According to Giles, Embed's platform was "experiencing multiple issues per day."  That

---

[9]  Complaints ¶ 39.
[10]  Complaints ¶ 40.

employee replied to Giles that "deep down, it's why I want to accelerate the signing of the DA [definitive agreement with WRS] . . . more issues are inevitable." Giles replied that "there shouldn't be this many issues."[11]

On June 10, 2022, the parties signed an "Agreement and Plan of Merger" containing substantially the same terms as the Memorandum of Terms.

On June 27, 2022, just a few weeks after WRS and Embed signed the definitive acquisition agreement, Beal and another senior employee exchanged messages regarding the Embed platform's inability to handle new user accounts. Beal acknowledged that WRS would not "pony up money to buy [Embed] if they thought we couldn't handle 1K accounts" and asked the other employee how many accounts Embed could handle given the FTX Stocks "launch plan" target of 10,000 new accounts. That employee replied to Beal that the platform "can't really take ANY accounts . . . I get MG [Michael Giles] has to basically lie to get the deals he gets, but there's fallout, and we aren't managing it[.]" Beal characterized the other employee's statement about Giles as "[f]air."[12]

An unaudited statement of financial condition for Embed as of March 31, 2022, which was included in the closing documents for the acquisition, reflected that Embed had total assets of approximately $37 million and a mere $25,000 in net revenue. Embed Clearing LLC, a wholly-owned subsidiary of Embed, had never reported any revenue at all. Although Giles asserted that Embed was worth $220 million at that time, he revealed to a reporter at the *Wall Street Journal* on May 19, 2022 that a WRS subsidiary was Embed's "first big client."[13]

---

[11] Complaints ¶ 41.
[12] Complaints ¶ 43.
[13] Complaints ¶ 44.

To incentivize speedy negotiations, WRS also agreed to pay Giles a retention bonus of $55 million— one-quarter of Embed's purported value. The stated purpose of that $55 million payment was to retain Giles as CEO through the acquisition's closing, though he was not obligated to stay in his role beyond that date. The result was that, between the signing of the acquisition agreement on June 10, 2022, and the closing of the acquisition on September 30, 2022, Giles was being paid approximately $490,000 *per day*, assuming he worked seven days every week. By contrast, during 2022, Giles' salary as Embed's CEO was $12,500 *per month*. The $55 million retention bonus awarded to Giles was on top of the approximately $103 million that Giles received at closing as Embed's largest shareholder.[14]

This unusual arrangement did not go unnoticed by Embed's other shareholders. A representative of Embed's second-largest shareholder, Propel Venture Partners, told Giles directly that he "ha[d] never seen so much of a deal this size go to a founder . . . just unusual proportions." Another representative of Propel Venture Partners indicated that he hoped Giles was getting paid in cash in light of turmoil in the cryptocurrency markets, stating: "Hopefully[] there's limited risk to cash exchanging hands given what's going on in the crypto/broader markets."[15]

Although numerous Embed employees were awarded retention payment agreements, Giles was the only one who was paid his full retention bonus on the September 30, 2022 closing date. The other employees, who were not involved in the negotiations, were obligated to remain at Embed for two years after closing to receive their full bonuses.

---

[14] Complaints ¶ 45.
[15] Complaints ¶ 46.

On June 23, 2022, Giles asked a senior Embed employee whether one of the documents provided to all Embed shareholders related to so-called "golden parachute" payments "show[s] how much I am getting [under the retention payment agreement.]"  She confirmed to Giles that the document reflected a $55 million bonus, due to him at closing, and then asked whether that was "what [he] was expecting."  Giles replied that it was, but that "hopefully people don't read it in too much detail[.]"[16]

On June 24, 2022, another senior employee at Embed wrote to his supervisor that he was concerned by the fact that the retention payment agreement stated that each Embed employee had been "encouraged" to seek their own legal counsel, but that Giles had told them there was no need to consult independent counsel.  He wrote:  "Seemingly the only reason I can come up with to [explain Giles] tell[ing] us to not get legal counsel is if there is some fast track timeline he has that he's trying to rush through."  That same day, the employee's supervisor asked Giles when employees "need to sign their docs."  Giles replied:  "[A]s soon as possible[.]"[17]

Although the acquisition process spanned approximately six months, from April 2022 through September 2022, most of that time was spent securing regulatory approvals for the acquisition.  The essential terms of the transaction were negotiated and agreed upon in only two weeks.[18]

---

[16] Complaints ¶ 47.
[17] Complaints ¶ 48.
[18] Complaints ¶ 38.

On September 30, 2022 (the "**Closing Date**"), the Embed Acquisition closed and WRS paid Defendants $236,764,105.34 and agreed to pay certain defendants retention bonuses totaling $63.5 million (the "**Transfers**").[19]

Just six weeks later, on November 11 and November 14, 2022 (the "**Petition Date**"), Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Code**") after it came to light that the FTX Insiders were engaged in a massive scheme to defraud creditors, including customers and investors.

## JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## LEGAL STANDARDS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) serves to test the sufficiency of the complaint, and a court's role is to determine whether the plaintiff is entitled to offer evidence in support of its claims. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000); *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)). To survive a motion to dismiss, a plaintiff must allege well-pleaded facts with sufficient detail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

---

[19] Complaints ¶ 5.

The Third Circuit has adopted a two-part analysis that courts must employ when deciding a motion to dismiss for failure to state a claim. *Fowler*, 578 F.3d at 210. "First, the factual and legal elements of a claim should be separated" with the reviewing court accepting "all of the complaint's well-pleaded facts as true, but . . . disregard[ing] any legal conclusions." *Id.* at 210-11. Next, the reviewing court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679); *Gellert v. Coltec Indus., Inc. (In re Crucible Materials Corp.)*, Nos. 09-11582 & 11-53885, 2012 WL 5360945, at *3 (Bankr. D. Del. Oct. 31, 2012). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 679. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. Proc. 8(a)(2)). This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## ANALYSIS

### I. Standing

Defendants argue that the Complaints must be dismissed in their entirety because the named plaintiffs have no enforceable interest in the funds they seek to recover and therefore fail to meet the threshold requirements of a claim for fraudulent transfer. *In re Green Field Energy Servs., Inc.,* No. 13-12783(KG), 2018 WL 6191949, at *37 (Bankr. D. Del. Nov. 28, 2018) ("As a predicate to avoiding any transfer, the Trustee must first prove that Debtor held an interest in the property transferred."); 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . of an interest of the debtor in property . . . ."). Specifically, Defendants argue that because the

Plaintiffs allege that the money used to fund the Embed acquisition was misappropriated from debtor FTX.com – which is not a party to these suits – Plaintiffs cannot establish that they had a legitimate interest in the money they seek to have returned.  In support of their position, Defendants cite to case law discussing the common law principle that a thief has no title in the property he steals.  *See, e.g.*, *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 929-31 (6th Cir. 2000).

Plaintiffs respond that the issue Defendants raise is now moot in light of the confirmation of the Debtors' plan of reorganization, which provides for the substantive consolidation of the Debtors' estates.  I agree.

"Substantive consolidation is an equitable doctrine that 'permits a Court in a bankruptcy case involving one or more related corporate entities, in appropriate circumstances, to disregard the separate identity of corporate entities, and to consolidate and pool their assets and liabilities and treat them as though held and incurred by one entity.'"  *In re Extended Stay, Inc.*, Nos. 09-13764-JLG, 11-02254-JLG, 2020 Bankr. LEXIS 2128, at *138-39 (Bankr. S.D.N.Y. Aug. 8, 2020) (quoting *In re Drexel Lambert Grp., Inc.*, 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992)) (citations omitted); *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir. 2005) ("Substantive consolidation treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for [i]nter-entity liabilities, which are erased).").  "The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor."  *Id.  See also In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 1401, 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. Oct. 31, 2003) ("Substantive consolidation has the effect of consolidating assets and liabilities of multiple debtors and treating them as if the liabilities were owed by, and the assets

held by, a single legal entity.") (citations omitted).  "Because its effect radically rearranges legal boundaries, assets and liabilities, substantive consolidation is typically a sparingly used remedy for debtors' conduct that blurs separateness so significantly that either the debtors' assets are so scrambled that unscrambling them is cost, time and energy prohibitive or creditors already perceive the debtors as simply a single unit and deal with them so."  *Genesis Health Ventures,* 402 F.3d at 423.

Courts have found that "substantive consolidation can confer standing on a trustee for purposes of satisfying the elements for the avoidance of fraudulent transfers."  *In re Extended Stay, Inc.*, Nos. 09-13764-JLG, 11-02254-JLG, 2020 Bankr. LEXIS 2128, at *164-67 (Bankr. S.D.N.Y. Aug. 8, 2020) (citing *Zazzali v. Mott (In re DBSI, Inc.)*, 447 B.R. 243, 248 (Bankr. D. Del. 2011); *Gray v. O'Neill Props. Group, L.P. (In re Dehon, Inc.)*, No. 02-41045, 2004 Bankr. LEXIS 1470, 2004 WL 2181669, at *6 (Bankr. D. Mass. Sept. 24, 2004) (setting motion for substantive consolidation for purposes of establishing timeliness and standing to assert fraudulent transfer claims); *In re Bonham*, 229 F.3d 750, 760 (9th Cir. 2000) (authorizing substantive consolidation of two non-debtor entities with debtor's estate where the entities were co-mingled and used by the debtor to perpetrate a Ponzi scheme, for the purpose of allowing trustee to commence fraudulent conveyance actions against the creditors of the consolidated non-debtor entities); *Kroh Bros. Realty Co. v. Kroh Bros. Mgmt. Co. (In re Kroh Bros.)*, 117 B.R. 499, 502 (W.D. Miss. 1989) (affirming bankruptcy court's grant of substantive consolidation, *nunc pro tunc*, so that debtor did not violate statute of limitations in bringing avoidance action)).

11

The Debtors' Plan of Reorganization (the "**Plan**"),[20] which was confirmed on October 7, 2024, provides for substantive consolidation of the Debtors' estates. Defendants did not object to confirmation of the Plan, nor have they argued in the context of prosecuting these Motions that substantive consolidation is inappropriate in these cases. Their only argument is that the "modified" consolidation contemplated in the Plan is limited and would be insufficient to confer standing on Plaintiffs. In support of this position, Defendants simply point to language in the first iteration of the Plan that describes the substantive consolidation contemplated therein as "for the purposes of voting, confirmation and distribution under the classification system proposed by the Plan [which separately classifies FTX.com customer claims and creditor claims]" which "will not result in the merger or affect the separate legal existence of any Debtor for any other purpose."[21]

While Defendants have accurately quoted the summary portion of the Plan, the section of the Plan devoted to the issue makes clear that the substantive consolidation sought by Debtors would have the effect of both cancelling intercompany claims and merging the liabilities of separate debtors for the purposes of implementation of the Plan:

> Except as otherwise provided herein and subject in all respects to the classification and treatment of Claims and Interests set forth in Article 4, as a result of the substantive consolidation of the Estates of the Consolidated Debtors: (a) all property of the Consolidated Debtors shall vest in, and constitute the property of, the Consolidated Wind Down Trust, free and clear of any and all Liens, charges or other encumbrances or interests, pursuant to Section 5.13; (b) all guarantees of any Consolidated Debtor of the payment, performance or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (c) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Wind Down Trust; (d) all

---

[20] Second Amended Plan of Reorganization, D.I. 26029; Order Confirming Second Amended Plan of Reorganization, D.I. 26404.

[21] Case No. 23-50380, Adv. D.I. 178 at 4-5 (Defendants' Reply Brief, quoting Draft Plan of Reorganization) (alterations in Reply Brief).

Cancelled Intercompany Claims shall be deemed cancelled; and (e) each Claim
filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be
deemed filed against the Consolidated Debtors and a single obligation of the
Consolidated Wind Down Trust.

Except as otherwise provided herein, the substantive consolidation set
forth in this Section 5.7 shall not:  (i) affect the separate legal existence of the
Consolidated Debtors for purposes other than implementation of the Plan pursuant
to its terms; (ii) constitute or give rise to any defense, counterclaim or right of
netting or setoff with respect to any Cause of Action  vesting in the Consolidated
Wind Down Trust that could not have been asserted against the Consolidated
Debtors; or (iii) give rise to any right under, any executory contract, insurance
contract or other contract to which a Consolidated Debtor is party, except to the
extent required by section 365 of the Bankruptcy Code in connection with the
assumption of such contract by the applicable Debtors. [22]

Defendants do not explain why this is not sufficient to confer upon Plaintiffs the necessary interest

in the property at issue, and I do not see any reason why it would not.

But even if substantive consolidation did not fully resolve the standing issue, the Debtors'

commingling of funds would.  *Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor*

*Holdings Corp.)*, No. 06-10894(PJW), 2009 Bankr. LEXIS 1815, at *7 (Bankr. D. Del. July 9,

2009) ("Money paid from a bank account containing commingled funds under a debtor's control

is presumptively property of the debtor.").  While the Complaints do not provide much detail

regarding this specific issue, there is an abundance of evidence in the record[23] about the Debtors'

mishandling of money, including an entire report devoted just to the issue of commingling.[24]  As

the introductory statement in that report explains, "from the inception of the FTX.com exchange,

the FTX Group commingled customer deposits and corporate funds, and misused them with

---

[22] D.I. 26029, Second Amended Plan of Reorganization, § 5.7.

[23] *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to
dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters
incorporated by reference or integral to the claim, items subject to judicial notice, matters of public
record, orders, and items appearing in the record of the case.").

[24] *See generally*, Second Interim Report of John J. Ray III to the Independent Directors: The
Commingling and Misuse of Customer Deposits at FTX.com, D.I. 1704.

abandon."[25]  In fact, the Debtors' commingling of funds was so prolific that even the team of

experts hired post-petition to disentangle the mess had difficulty doing so.  As the report

explains, "[n]otwithstanding extensive work by experts in forensic accounting, asset tracing and

recovery, and blockchain analytics, among other areas, it is extremely challenging to trace

substantial assets of the Debtors to any particular source of funding, or to differentiate between

the FTX Group's operating funds and deposits made by its customers."[26]  I find this information

in the record to be sufficient to establish Plaintiffs' interest in the property they seek to recover.

## II.    <u>Section 550 – Initial or Subsequent Transferees</u>

Defendants' second argument also stems from the Plaintiffs' allegations regarding the

misappropriation of money by the FTX Insiders and Alameda from FTX.com.  Specifically,

Defendants argue that because Plaintiffs have alleged that the funds used to complete the Embed

Acquisition originated with FTX.com, Defendants must be considered "subsequent" transferees

rather than "initial" transferees.  As subsequent transferees, Defendants contend, they are

protected from avoidance entirely because they took the transfers in good faith.  See <u>11 U.S.C. §</u>

<u>550(a)(1)</u> (providing that a trustee may recover property transferred in an avoided transaction

from "the initial transferee of such transfer or the entity for whose benefit such transfer was

made"); *id.* § 550(a)(2) (providing that plaintiffs may recover an avoided transfer from any

"immediate or mediate transferee of such initial transferee"); *id.* § 550(b)(1) ("[T]he trustee may

not recover under section (a)(2) of this section from [ ] a transferee that takes for value, including

satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of

the voidability of the transfer avoided").

---

[25] *Id.*
[26] *Id.* at 3.

As with the question of standing, I find that the question of Defendants' status as a subsequent transferee (and application of the good faith defense here) has been mooted by the proposed substantive consolidation of the Debtors' estates.  *See Opportunity Fin., LLC v. Kelley*, 822 F.3d 451, 461 (8th Cir. 2016) (Bye, J. dissenting) (observing that substantive consolidation had the effect of stripping defendants of both their standing argument and their good faith defense).

III.    **Actual Fraudulent Transfer**

Plaintiffs assert claims for actual fraudulent transfer in Count I (pursuant to Section 548(a)(1)(A) of the Code) and Count III (under the Delaware Uniform Fraudulent Transfer Act ("**DUFTA**"), 6 Del. C. § 1304(a)(1) pursuant to Section 544(b) of the Code) of the Complaints. Defendants have moved to dismiss both claims on the grounds that they are devoid of facts showing that the Embed acquisition was undertaken with "actual intent to hinder, delay, or defraud" any of Plaintiffs' creditors, as required by the relevant statutes.

It is well-established that a plaintiff may establish intent in an actual fraudulent transfer case in one of two ways: (1) through direct evidence; or (2) through circumstantial evidence. *Friedman v. Wellspring Capital Mgmt., LLC (In re SportCo Holdings, Inc.)*, Nos. 19-11299, 20-50554 (JKS), 2021 Bankr. LEXIS 2848, at *33 (Bankr. D. Del. Oct. 14, 2021) ("For an actual fraudulent transfer claim to survive a motion to dismiss, the plaintiff must allege facts that, taken as true, establish direct or circumstantial evidence of intent to defraud.").  "Because debtors rarely admit fraudulent intent, courts must usually infer it."  *MSKP Oak Grove, LLC v. Venuto*, 839 Fed. Appx. 708, 712 (3d Cir. 2020).  To demonstrate fraudulent intent in the absence of direct evidence, claimants typically rely on "'badges of fraud,' *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."

15

*Kirschner v. Large S'holders (In re Tribune Co. Fraudulent Conveyance Litig.)*, <u>10 F.4th 147, 160</u> (2d Ci<u>r. 2021)</u>.  The "badges of fraud" that courts often refer to include:  "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction."  *Id.*  Pleading a single badge of fraud is insufficient to state viable claim for relief; rather, a "confluence of several in one transaction" is generally required.  *In re Zohar III Corp.*, <u>631 B.R. 133</u>, <u>174</u> (Bankr. D. Del. 2021).

Plaintiffs' actual fraudulent transfer claims must satisfy the heightened pleading standards of Rule 9(b).  *See In re Cred Inc.*, <u>650 B.R. 803</u>, <u>834</u> (Bankr. D. Del. 2023). Rule 9(b) requires a plaintiff to "plead with particularity the 'circumstances' of the alleged fraud." *In re Our Alchemy, LLC*, <u>2019 WL 4447545</u>, at *5 (Bankr. D. Del. Sept. 16, 2019) (quoting *Seville Indus. Mach. Corp.* v. *Southmost Mach. Corp.*, <u>742 F.2d 786, 791</u> (3d Ci<u>r. 1984))</u>.  "Fraudulent intent, however, may be pled generally."  *In re Millennium Lab Holdings II,* <u>2019 WL 1005657</u>, at *3 (Bankr. D. Del. Feb. 28, 2019).

Defendants argue that Plaintiffs have not alleged facts that would support a finding of fraudulent intent either directly or circumstantially.  Specifically, they argue that none of the fraud allegations in the Complaints relate to the Embed acquisition but instead relate only to the FTX Insiders' fraudulent misappropriation of FTX.com customer funds generally.  Additionally, Defendants allege that the Complaints do not include facts sufficient to find the existence of badges of fraud.

Plaintiffs respond that they have alleged facts supportive of the conclusion that the Debtors engaged in the Embed acquisition as part of a larger fraudulent scheme designed to increase the FTX Group's influence and finance acquisitions that would project an image of growth. They argue that "it is well-established that transfers 'driven by a desire to stay in business,' or made to 'create a façade that the Debtor was running a successful business,' support an inference of actual fraud." Opposition Brief, D.I. 153 at 12 (quoting *In re Sentinel Mgmt. Group, Inc.*, 728 F.3d 660, 664, 667 (7th Cir. 2013). In further support of their position, Plaintiffs point to the similarities between this case and the facts before this Court in *Drivetrain, LLC* v. *X Com., Inc.*, C.A. No. 22-50448, 2023 WL 1804627 (Bankr. D. Del. Feb. 7, 2023).

Plaintiffs argue that in *Drivetrain,* as here, "the allegation is not that the debtor was moving its assets into friendly hands where the creditors cannot reach them," but rather "that the transaction was part of an elaborate ruse that played a critical role in the debtor's larger fraudulent scheme." Opposition Brief at 13 (quoting *Drivetrain*). They contend that "here, as in *Drivetrain,* the fraudulent transfer was one piece 'of an elaborate head fake' by the FTX Insiders 'to trick investors [and customers] into believing that the company was ... successful enough to afford [the Embed Acquisition]' and profitable enough to expand into new markets. The Embed Acquisition, 'therefore, served no other purpose but to allow [the FTX Insiders] ... to perpetuate fraud on [the FTX Group's] ... investors.'" Plaintiff's Opposition Brief, D.I. 154 at 14 (quoting *Drivetrain*) (alterations in original).

While I agree that the scheme Plaintiffs describe in their briefing might very well be sufficient at this stage of the case to support a finding of actual intent, it is not supported by the facts alleged in the Complaints. Transfers made in furtherance of a larger scheme to defraud may support an inference of fraudulent intent, but only where the allegations of the complaint connect

the specific transfers to the scheme.  In other words, the complaint must explain how exactly the allegedly fraudulent transfers further the fraudulent scheme.  This Plaintiffs did not do.

In *Drivetrain*, the Court was able to point to specific allegations in the Complaint that supported plaintiff's theory of the fraud and connected the transfers to the fraudulent scheme alleged.  For example, while the *Drivetrain* Court concluded that "the complaint fairly alleges that the debtor entered into these contracts as part of an elaborate head fake," *id.* at *9, this conclusion was supported by specific allegations that detailed how entering into the contract at issue furthered the alleged fraud:

> The complaint alleges that neither the select nor premier partnership agreement provided the debtor with any benefit. Rather, "Rogas and his associates caused Debtor to engage with several platform partners to create a façade that Debtor was running a successful business." The alleged scheme played out as follows: Rogas would cause the debtor to enter into various partnership agreements with several platform partners, including Magento. Magento calculated its fees based on revenue reports submitted by the debtor detailing how much revenue was earned using Magento's services. Rogas would falsify these revenue reports to give the appearance of a profitable company, even claiming at one point that the debtor earned $26.5 million in revenue from customers obtained through Magento. Rogas would then use those same revenue reports as "proof" that the debtor was a successful business to attract additional investors. In short, these partnership contracts were "critical component[s] of Rogas' fraudulent scheme."

*Drivetrain, LLC v. X.commerce, Inc.*, No. 22-50448, 2023 Bankr. LEXIS 307, at *2-3 (Bankr. D. Del. Feb. 7, 2023).

Here, I cannot make those connections.  Although Plaintiffs argue that the Complaints allege "that the FTX Insiders were engaged in a fraudulent scheme, that they needed to continue projecting a false image of profitability, growth, and legitimacy to sustain that scheme, and that the Embed acquisition was part of that scheme," the specific allegations they cite to say nothing of the kind.  On the contrary, they suggest entirely different purposes for the acquisition, including that (1) "the FTX Insiders purportedly pursued the Embed acquisition because they believed it would

help expand FTX.US's operations into conventional securities markets, thereby enriching themselves as WRS shareholders;"[27] and (2) "the FTX Insiders acquired the funds to purchase Embed in a self-dealing, opaque manner designed to obscure the malfeasance that ultimately led Plaintiffs to file a Chapter 11 case," *i.e.*, the "true nature of the relationship between Alameda and FTX[.]"[28]  While Plaintiffs also cite in their Complaints to documents in the related criminal case against the FTX Insiders, none of them make any mention of the Embed acquisition specifically.[29]  There is simply nothing in either the Complaints or the documents incorporated by reference that explains how the Embed acquisition furthered the fraudulent scheme.  For that reason, I find that the Complaints do not directly allege actual fraudulent intent.[30]

Plaintiffs argue that even if I find the Complaints lack explicit allegations of intent that Defendants' Motions must still be denied because Plaintiffs have pled the existence of sufficient "badges of fraud" to support an inference of fraudulent intent.  Specifically, Plaintiffs contend that their allegations regarding insolvency and a lack of reasonably equivalent value are sufficient to infer intent, citing to my decision in *In re J&M Sales, Inc.*, 2021 Bankr. LEXIS 2268, at *88-89 (Bankr. D. Del. Aug. 20, 2021).  Plaintiffs have misread the *J&M* decision.  While allegations of insolvency and a lack of reasonably equivalent value were sufficient in that case to state a claim for *constructive* fraudulent transfer, they were not sufficient to state a claim for *actual* fraudulent transfer.  As I explained:

---

[27] Complaints ¶ 28.

[28] Complaints ¶ 34, 49.

[29] Case No. 23-50380, Adv. D.I. 154.

[30] For this same reason, I find that Plaintiffs have not alleged facts supportive of the conclusion that the FTX Insiders were operating a *de facto* Ponzi scheme, as Plaintiffs suggest in a footnote in their brief. Plaintiffs' Opposition Brief, D.I. 153, at 14 n. 5.  To be clear, I am not making any finding regarding the applicability of the "Ponzi scheme presumption" in this or any other case connected to these debtors.  *See generally Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) (discussing the Ponzi scheme presumption).  Rather, I am simply holding that the application of the presumption is not supported by the facts alleged in the Complaints.

> These two alleged badges of fraud . . . are insufficient to support a claim for actual fraudulent conveyance. Indeed, combined, these allegations merely state the definition of a claim for constructive fraudulent transfer. *See AgFeed*, 546 B.R. at 336 ("A claim of constructive fraud, however, need not allege the common variety of deceit, misrepresentation, or fraud in the inducement...because the transaction is presumptively fraudulent and all that need be alleged is that the conveyance was made without fair consideration while the debtor was functionally insolvent.") (internal quotations omitted). Delaware Bankruptcy Courts have long recognized that there is a distinction between actual and constructive fraudulent transfer claims and the facts needed to support them.

*Miller v. Fallas (In re J & M Sales, Inc.)*, Nos. 18-11801 (JTD), 20-50775, 2021 Bankr. LEXIS 2268, at *95-96 (Bankr. D. Del. Aug. 20, 2021). *See also In re Trib. Co. Fraudulent Conv. Litig.*, No. 11-MD-2296 (RJS), 2017 WL 82391, at *14 (S.D.N.Y. Jan. 6, 2017), *aff'd*, 10 F.4th 147 (2d Cir. 2021) (finding insolvency and lack of reasonably equivalent value insufficient to support inference of actual intent when standing alone because "[t]o hold otherwise would turn every constructive fraudulent conveyance claim into an actual fraudulent conveyance claim and thereby undermine the distinction between the two claims."). As the only badges of fraud alleged in the Complaints are insolvency and lack of reasonably equivalent value, fraudulent intent also cannot be inferred from the circumstances.

For these reasons, Defendants' Motions with respect to the actual fraudulent transfer claims in the Complaints (Counts I and III) are granted.

## IV. Constructive Fraud

### A. Section 546(e)

Defendants next argue that Counts II, III, and IV of the Complaints, asserting claims for constructive fraudulent transfer and state law fraudulent transfer, are barred by Section 546(e) of the Code. Section 546(e) provides a "safe harbor" against certain fraudulent transfer claims arising out of securities transactions. It states, in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) . . . , the trustee may not avoid a transfer that is a margin payment . . . , or settlement payment, as defined in section 101 or 741 of this title [11 USCS § 101 or 741], made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7) [11 USCS § 741(7)], commodity contract . . . , or forward contract, that is made before the commencement of the case [.]

11 U.S.C. § 546(e).  "Put simply, the safe harbor applies where two requirements are met: (1) there is a qualifying transaction (i.e., there is a 'settlement payment' or a 'transfer payment' . . . made in connection with a securities contract) and (2) there is a qualifying participant (i.e., the transfer was 'made by or to (or for the benefit of) a . . . financial institution').  *In re Nine W. LBO Sec. Litig.,* 482 F. Supp. 3d 187, 197 (S.D.N.Y. 2020), *aff'd in part, vacated in part, remanded sub nom. In Re: Nine W. LBO Sec. Litig.,* 87 F.4th 130 (2d Cir. 2023).  The parties here do not dispute that the Embed acquisition constitutes a qualifying transaction.  Rather, their dispute centers on whether Defendants are qualifying participants.

Defendants argue plaintiff WRS and Defendants are both qualifying participants because they constitute "financial institutions" under Section 101(22)(A) of the Code, which "defines a 'financial institution' to include a 'customer' of a bank or other such entity 'when' the bank or other such entity 'is acting as agent' for the customer 'in connection with a securities contract.'" *Nine West,* 87 F.4th at 145 (emphasis omitted) (quoting 11 U.S.C. § 101(22)(A)).  Here, Defendants contend, because Western Alliance Bank ("**Western**") was acting as agent for both WRS and Defendants in connection with the Transfers, WRS and/or Defendants must also be considered financial institutions.  In support of their position, Defendants rely on the Second Circuit's decision in *Tribune* and its progeny.  *In re Tribune Co. Fraudulent Conv. Litig.,* 2019

WL 1771786, at *9-11 (S.D.N.Y. Apr. 23, 2019) (holding that Tribune was CTC's customer and thus a "financial institution" for purposes of section 546(e) because "Tribune engaged the CTC's services as depositary" and "CTC was entrusted with billions of dollars of Tribune cash and was tasked with making payments on Tribune's behalf to Shareholders upon the tender of their stock certificates to CTC"), *aff'd*, 10 F.4th 147 (2d Cir. 2021); *see also Holliday v. Credit Suisse Sec. (USA) LLC (In re Bos. Generating, LLC),* No. 21-2543-br, 2024 U.S. App. LEXIS 23800, at *8-9 (2d Cir. Sep. 19, 2024) (affirming dismissal of fraudulent conveyance claims as safe-harbored and holding that customer of a bank acting as depository and distributor of proceeds was "financial institution" for purposes of section 546(e)); *In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187, 202 (S.D.N.Y. 2020), *aff'd in part, vacated in part, remanded sub nom. In Re: Nine W. LBO Sec. Litig.,* 87 F.4th 130 (2d Cir. 2023) (dismissing fraudulent conveyance claims as safe-harbored and holding that customer of a bank acting as distributor of merger consideration was a "financial institution" for purposes of section 546(e)).

Plaintiffs counter with two arguments. First, they argue that this Court should not follow the line of decisions from the Second Circuit on this issue because their holdings conflict with the United States Supreme Court's ruling in *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 896-97 (2018). Second, Plaintiffs contend that even if I were to agree with the Second Circuit's interpretation of Section 546(e), the Motions still must be denied because Defendants either have not established that Western was acting as an agent for either WRS or Defendants or, at the very least, its status as agent is a question of fact not amenable to resolution on a motion to dismiss. I agree.

While, for several reasons, I am not persuaded that the Second Circuit's interpretation and application of the "customer exception" in Section 101(22)(A) is correct,[31] it makes no difference to the outcome of the Motions before me because I cannot determine whether an agency relationship existed based on the limited record before me.  Generally, the application of Section 546(e) requires fact-intensive determinations that are not appropriate for resolution at the motion to dismiss stage. *In re Centaur, LLC*, No. 10-10799, 2013 Bankr. LEXIS 3404, 2013 WL 4479074 at *4 (Bankr. D. Del. Aug. 19, 2013); *see also Zazzali v. AFA Fin. Grp., LLC*, No. 10-54524, 2012 Bankr. LEXIS 4045, 2012 WL 4903593 at *11 (Bankr. D. Del. Aug. 28, 2012) ("[I]t is premature to dismiss this count on the basis of the 546(e) defense. The application of the defense is a fact-based inquiry.") (citing *Brandt v. B.A. Capital Co. LP* (*In re Plassein Int'l Corp.*), 366 B.R. 318, 323-25 (Bankr. D. Del. 2007), *aff'd*, 590 F.3d 252, 254-56 (3d Cir. 2009)). Accordingly, at the motion to dismiss stage, courts in this district will consider

---

[31]  As at least one court and several other authorities have observed, the Second Circuit's interpretation of Section 101(22)(A) and its broad definition of what constitutes an agency relationship effectively guts the Supreme Court's ruling in *Merit Management*.  *See Greektown Litig. Tr. v. Papas (In re Greektown Holdings, LLC)*, 621 B.R. 797, 827-28 (Bankr. E.D. Mich. 2020) (noting that *Tribune* "does not distinguish between mere intermediaries contracted for the purpose of effectuating a transaction and agents who are authorized to act on behalf of their customers in such transactions and "result[s] in a complete workaround of *Merit Management*, which opined that the safe harbor provision does not insulate a transfer simply because a qualified intermediary acted as a mere conduit"); *see also* Brief for the United States as *Amicus Curiae, Deutsche Bank Trust Company Americas v. Robert R. McCormick Foundation*, No. 20-8 (2021), available at https://www.supremecourt.gov/ DocketPDF/20/20-8/ 171849/20210312182244408_20-8%20DeutscheBank.pdf (observing that *Tribune*'s interpretation of Section 101(22)(A) "would render *Merit Management* a virtual nullity").  Widespread application of the Second Circuit's interpretation would place nearly every transaction involving a security beyond the reach of the bankruptcy trustee. *Id.* (noting that under *Tribune*'s interpretation, "the safe harbor will apply to virtually every transfer made in connection with a securities contract, since some party to almost every such transfer will rely on a 'financial institution' to help 'effectuate' the transaction.").  Such an absurd result cannot be what Congress intended in drafting Section 101(22)(A).  *See generally* Marchetti, Peter V., *"Section 546(d) Redux – The Proper Framework for the Construction of the Terms Financial Institution and Financial Participant Contained in the Bankruptcy Code after the U.S. Supreme Court's Holding in* Merit*,* 43 Cardozo L. Rev. 1107 (2022) (proposing that the legislative history of both Section 546(e) and Section 101(22)(A) suggest that the customer language in the latter was meant to be quite limited in scope).

an affirmative defense based on the safe harbor provision only "where the defense is clearly established on the face of the complaint." *Zazzali*, 2012 Bankr. LEXIS 4045, 2012 WL 4903593 at *11; *see also In re DBSI, Inc.*, 477 B.R. 504, 515 (Bankr. D. Del. 2012); *Brandt*, 366 B.R. at 323-25. As discussed below, the elements of the Section 546(e) safe harbor defense are not immediately apparent from the face of the Complaints.

The Complaints here provide no details at all about the logistics of the transfers. They refer to the Merger Agreement and Paying Agent Agreement generally, but there is nothing in the record that would support the conclusion that the transfers were made in the manner described in those agreements. For this reason, the Motions to dismiss based on application of Section 546(e) are denied. *See Carickhoff v. Cantor (In re Live Well Fin., Inc.),* Nos. 19-11317 (LSS), 21-50990 (LSS), 2023 Bankr. LEXIS 1554, at *37-38 (Bankr. D. Del. June 13, 2023) (denying motion to dismiss where complaint did not plead how the transfers were made and agreements showed the plan for payment transfers but "there [was] no evidence that Live Well actually made payments in accordance with the Stock Purchase Agreement").

**B. Failure to Plead**

Counts II and IV of the Complaint plead claims for constructive fraudulent transfers pursuant Sections 548 and 544 of the Code and DUFTA. 11 U.S.C. §§ 544 and 548(a)(1)(B); 6 Del. C. § 1304(a)(2). Defendants have moved to dismiss these claims for insufficient pleading. A claim for constructive fraudulent transfer requires a plaintiff to establish that:

(i) the transfers were made within two years of the petition date;

(ii) the debtor received less than reasonably equivalent value in exchange of the transfers; and

(iii) the debtor either (a) was insolvent on the date that the transfers were made or became insolvent as a result of the transfers; or (b) was or was about to engage in a business or transaction for which any remaining property remaining with the

debtor was an unreasonably small capital; or (c) intended or believed that the debtor would incur debts beyond the debtor's ability to pay; or (d) the debtor made the transfer or incurred the obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B). Unlike the claim for actual fraudulent transfer, a claim for constructive fraudulent transfer need only be pled pursuant to the requirements of Rule 8(a). *Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 310 (Bankr. D. Del. 2010).

At the motion to dismiss stage, to adequately plead a constructive fraud claim 'all that is needed ... is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent.'" *Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA Publ'g, LLC)*, 602 B.R. 256, 266 (Bankr. D. Del. 2019) (quoting *In re AgFeed USA, LLC*, 546 B.R. 318, 336 (Bankr. D. Del. 2016). "[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007); *Emerald Capital Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft (In re Fah Liquidating Corp.)*, 572 B.R. 117, 127 (Bankr. D. Del. 2017) (["D]isputes as to the actual value of the transfer or value given in exchange for the transfer do not need to be decided on a motion to dismiss so long as the Trustee has identified the transfer by date and face amount and has alleged that it was for no consideration.") (internal quotations omitted).

Defendants argue that Plaintiffs have not sufficiently alleged a lack of reasonably equivalent value because they rely on facts that occurred after the transfer.[32] *In re Taylor*, 386

---

[32] Defendants also argue that the Plaintiffs' claims should be dismissed because they have not pled facts showing that the transferor, WRS, was insolvent at the time of, or rendered insolvent by the Embed acquisition. However, as discussed above, the substantive consolidation of the Debtors' estates means that the Court can look to the aggregate solvency of the Debtors' estates at this stage of the case. *Zazzali v. Mott (In re DBSI, Inc.)*, 447 B.R. 243, 248 (Bankr. D. Del. 2011) (holding that trustee's allegations of insolvency of the debtor entities collectively was sufficient to meet the insolvency criteria for fraudulent transfer analysis because the relevant debtor entities have been substantively consolidated). The

B.R. 361, 370 (Bankr. S.D. Fla.), *aff'd sub nom. United States v. Kapila*, 402 B.R. 56 (S.D. Fla. 2008) ("When determining if a given exchange is for reasonably equivalent value, [the Court is] required to look to the time of that transfer and not beyond that point.").    The allegations about which Defendants complain are those that relate to what the Debtors were able to obtain for Embed in a post-petition sale. *See e.g.*, Complaints ¶¶ 56-62 (describing bidding process that resulted in only a single bid for $250,000). But even if I set those allegations aside, I would still find that Plaintiffs have sufficiently pled a lack of reasonably equivalent value because the allegations regarding information known at the time of the Transfers is sufficient.

The Complaints allege that WRS paid $220 million for Embed, plus a retention bonus of $55 million to Giles, though Embed's statement of financial condition reflected that the company had assets worth only $37 million and net revenue of only $25,000.[33] The Complaints further allege that the software platform, which was the purported focus of the acquisition, was plagued with bugs and incapable of handling "ANY" new accounts, let alone the 10,000 that FTX had planned.[34] This is sufficient at this stage of the case to support the conclusion that Debtors did not get the value of what they gave.

For these reasons, the Motions are denied with respect to the constructive fraudulent transfer claims.

---

Plaintiffs' allegations here regarding the insolvency of the FTX Group is sufficient. See Complaints ¶¶ 65-67.

[33] Complaints ¶ 44.

[34] Complaints ¶ 43.

V.    **Preference**

Defendant Giles moves to dismiss Count V of the Complaint in the case against him, which seeks to avoid as a preferential transfer the $55 million retention payment (the "**Retention Payment**") he received in connection with the Embed acquisition.[35]

Section 547(b) of the Code allows for the avoidance of certain transactions between a debtor and its creditors that occurred within the ninety days prior to the petition date. 11 USC § 547(b). In order to avoid a prepetition preferential transfer, the plaintiff must show the transfer was (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; and (5) that enables such creditor to receive more than such creditor would receive in a liquidation. *Id.*  Defendants argue that Plaintiffs cannot state a claim for preferential transfer as to the Retention Payment to Giles because they cannot establish that it was made on account of an antecedent debt.

Plaintiffs allege in the Complaints that the obligation to pay Giles arose when the parties agreed to it as a part of their initial negotiations, which occurred in April, 2022, when the Memorandum of Terms was signed, and reaffirmed in June, 2022, when the Merger Agreement (on substantially the same terms) was signed.[36]  Plaintiffs made the Retention Payment to Giles on the closing date, September 30, 2022.

Defendants argue that because any payment to Giles was contingent upon the closing of the transaction, the obligation to pay Giles did not arise until the Embed acquisition closed on

---

[35] Case No. 23-50380, Adv. D.I. 1.
[36] *Id.* ¶ 38.

September 30, 2022.[37]  Because the payment to Giles was made on the same day that it became

due, Defendants argue, it does not qualify as antecedent debt.

    "Antecedent debt" is not defined in the Bankruptcy Code. The Code does, however,

define "debt" as a "liability on a claim." 11 U.S.C. § 101(12). "Claim" is defined as a "'right to

payment,' regardless of whether that right is fixed, contingent, matured, or unsecured." *Pirinate*

*Consulting Grp., LLC v. Kadant Sols. Div. (In re NewPage Corp.)*, 569 B.R. 593, 599 (D. Del.

2017); 11 U.S.C. § 101(5)(A). This court has held that a debt is antecedent "if it was incurred

prior to the allegedly preferential transfer." *Burtch v. Huston (In re USDigital, Inc.),* 443 B.R.

22, 36 (Bankr. D. Del. 2011).  *See also First Jersey Sec. Inc.*, 180 F.3d 504, 510 (3d Cir. 1999).

"[T]o determine when a debt was incurred — and whether it was incurred before the transfer

was made — courts look to 'when the debtor becomes legally obligated to pay.'" *Pirinate*, 569

B.R. at 599 (citing *In re Philadelphia Newspapers, LLC,* 468 B.R. 712, 722 (Bankr. E.D. Pa

2012)).  Here, the parties' contract provides that the Debtors did not become obligated to pay

Giles until the Embed acquisition closed.

    Though the parties may have reached an agreement in principle in April, the agreement

that governs the Retention Payment provides that payment "will vest and become payable as of

the Effective Date," which was also September 30, 2022.[38]  This was, as Plaintiffs acknowledge,

the same day that the Retention Payment was made.[39]  Where a debt is paid at the same time it

becomes due, it is not an antecedent debt.  *Hechinger Inv. Co. of Del., Inc. v. Universal Forest*

*Prods. (In re Hechinger Inv. Co. of Del., Inc.)*, 489 F.3d 568, 574 (3d Cir. 2007) ("If there is no

---

[37] Case No. 23-50380, Adv. D.I. 98 at 46.
[38] Case No. 23-50380, Adv. D.I. 101, Ex. 3 (Retention Incentive Award Agreement).
[39] Complaints ¶ 5 ("Defendant Giles was paid his $55,000,000 retention bonus in full on the September 30, 2022 closing date of the transaction.").

delay between when the debt arises and payment of the obligation, then the transfer is outside the scope of § 547(b)[.]").[40]

      While Plaintiffs point to the Merger Agreement as the source of the Retention Payment obligation, this does nothing to advance their position. The Merger Agreement makes clear that: (1) Retention Payments will not become effective until the closing date; and (2) they will be governed by the Award Agreements, not the Merger Agreement. The applicable provision, in relevant part, states:

> Buyer shall adopt a retention incentive program (the "Retention Incentive Program") effective as of the Closing . . . . Without limiting the foregoing, the Retention Incentive Program shall authorize the issuance of awards that, in the aggregate, equal $75,000,000, of which $55,000,000 will be payable to the Founder at Closing, in each case, less applicable Tax withholdings. Prior to the Effective Time, Buyer shall provide each employee selected to participate in the Retention Incentive Program with a Retention Incentive Award Agreement, which reflects the employee's award under the Retention Incentive Program. [41]

The Merger Agreement, therefore, does not support Plaintiffs' position.

      For all these reasons, Giles' motion with respect to Count V of the Complaint against him is granted.

---

[40] For this same reason, I find the cases cited by Plaintiffs for the proposition that the debt associated with retention programs such as this one arises when the contract is signed to be inapposite. *See, e.g., In re Enron Corp.,* 357 B.R. 32, 38 (Bankr. S.D.N.Y. 2006) (concluding that "[a] 'debt' was created at the time the [employment] agreement was signed"); *In re Dearborn Bancorp, Inc.,* 583 B.R. 395,406 (Bankr. E.D. Mich. 2018) ("a debtor's debt is incurred and arises for Section 547(b)(2) purposes as soon as the debt exists, even [if] at that time it is still a contingent or unmatured debt."); *In re PostRock Energy Corp.,* No. 16-11230, Adv. Pro. 18-01027, 2019 WL 137116, at *9 (Bankr. W.D. Okla. Jan. 8, 2019) ("This Court agrees with many courts that find that the 'debt' associated with bonus and retention plans arise when the contract, agreement or plan is formed and put in place rather than when the payment becomes due."). Even assuming, *arguendo,* that an obligation does arise when a contract is signed, the contract here was signed on the same day that the payment was made. A payment made on the same day the obligation arises cannot be one made on account of antecedent debt. *Official Comm. of Unsecured Creditors of Wash. Mut., Inc. v. Corcoran (In re Wash. Mut., Inc.),* Nos. 08-12229 (MFW), 10-53158 (MFW), 2013 Bankr. LEXIS 2885, at *14 (Bankr. D. Del. July 16, 2013) ("[B]ecause the severance was paid on the same date that WMI's obligation arose, the Court finds that the severance payment was not made on account of an antecedent debt.").

[41] Case No. 23-50380, Adv. D.I. 100, Exhibit 1, Section 7.3.

**VI.**     <u>**Other Retention Payments**</u>

Defendants next argue that Plaintiffs' claims in Counts I-IV of the Complaints to avoid post-closing retention payments to defendants other than Giles should be dismissed for failure to plead.  Specifically, Defendants argue that the obligation to make any such payment lies with Embed, a non-debtor, and additionally, plaintiffs do not allege facts showing that such obligations are fraudulent.

Plaintiffs respond that the Award Agreements do not place any affirmative obligation on Embed itself, but instead provide that WRS would cause Embed or another member of the FTX Group to make the payments.  See Award Agreement at 2 ("Buyer will cause the Company (or, if applicable, another member of the FTX Group) to pay or cause to be paid to Employee each Retention Incentive Payment . . . .").  They further respond that because the retention payments were an integral party of the Embed transaction, they are alleged to be fraudulent for the reasons applicable to all of the other transfers that made up the Embed acquisition.  I agree.

The above-quoted portion of the Award Agreement makes clear that ultimate responsibility for the retention payments rests with WRS.  See *Chrysler Corp. v. Airtemp Corp.*, <u>426 A.2d 845, 851</u> (Del. Super. Ct. 1980) (interpreting agreement that provided that "Fedders agrees to pay, or cause to be paid," as meaning that "the source of payment to which Chrysler was intended to look was Fedders").  As such, Plaintiffs may seek to avoid them.  *See* <u>11 U.S.C. §§ 544(b)</u>, <u>548(a)(1)(A)</u>, <u>548(a)(1)(B)</u> (allowing trustee to avoid "any obligation [ ] incurred by the debtor").

On the question of whether the Complaints sufficiently allege the fraudulent nature of the retention payments, I find that they do.  The Complaints allege that the retention payments were made as part of the deal to acquire Embed.  Complaints ¶ 38 ("WRS and Embed had signed the

'Memorandum of Terms,' which ascribed a $220 million enterprise value to Embed and provided for $75 million in retention bonus payments to Embed employees. . . .").  It is therefore appropriate to infer that they are alleged to be fraudulent for the same reasons as the rest of the acquisition consideration.   Defendants Motions as to the remaining retention payments are therefore denied.

## VII.    Remaining Counts

Finally, Defendants move to dismiss the last two counts of each complaint,[42] which assert claims for property recovery pursuant to Section 550(a)(1) of the Code and disallowance of claims pursuant to Section 502(d) of the Code.  Defendants argue that these claims should be dismissed because they depend on a finding of primary liability on Plaintiffs' other claims, which Defendants have moved to dismiss.  Because some of the fraudulent transfer claims have survived Defendants' motions to dismiss, these counts are likewise permitted to proceed.  The Motions as to the final two counts of the Complaints are denied.

## VIII.    Leave to Amend

Finally, Plaintiffs argue in their opposition brief that should the Court grant the motions in whole or in part, the Court should grant Plaintiffs leave to amend the Complaint.  I disagree. Plaintiffs were entitled to amend their complaint as a matter of course within the 21 days following Defendants' service of their motion to dismiss.  Fed. R. Civ. Proc. 15(a)(1).  Plaintiffs chose to respond to the Motions instead of further revising the Amended Complaint. Accordingly, leave of court or the consent of the opposing party is now required for further amendment.  Fed. R. Civ. Proc. 15(a)(2).

---

[42] Counts V and VI in Case No. 23-50379 and Counts VI and VII in case No. 23-50380.

Rule 15(a) provides that "the Court should freely give leave when justice so requires." However, leave must be properly requested. As I have previously held, "[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *In re Our Alchemy, LLC*, 642 B.R. 155, 172 (Bankr. D. Del. 2022) (citations omitted). As the Third Circuit has explained, "a 'bare request in an opposition to a motion to dismiss — without any indication of the particular grounds on which amendment is sought . . . — does not constitute a motion within the contemplation of Rule 15(a).'" *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 243 (3d Cir. 2013) (quoting *Kowal v. MCI Communications Corp.*., 16 F.3d 1271, 1280, 305 U.S. App. D.C. 60 (D.C. Cir. 1994)).

## CONCLUSION

For the reasons set forth above, the Motions are DENIED in part and GRANTED in part. Separate orders will be issued in each adversary proceeding.

Dated:  October 23, 2024

JOHN T. DORSEY, U.S.B.J.